UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUTUMN N. YETTAW,

                Plaintiff,           Civil Action No. 13-15091
                                        Honorable Terrence G. Berg
                                        Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 15]

Plaintiff Autumn M. Yettaw ("Yettaw") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 15], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Yettaw is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [15] be GRANTED, Yettaw's Motion for Summary Judgment [11] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

II.    **REPORT**

A.    **Procedural History**

On March 8, 2011, Yettaw filed applications for DIB and SSI, alleging a disability onset date of December 31, 2007.  (Tr. 164-76).  These applications were denied initially on July 5, 2011.  (Tr. 127-35).  Yettaw filed a timely request for an administrative hearing, which was held on May 29, 2012, before ALJ Chris Ambrose.  (Tr. 39-74).  Yettaw, who was not represented by an attorney, testified at the hearing, as did vocational expert Carrie Anderson.  (*Id.*).  On June 26, 2012, the ALJ issued a written decision finding that Yettaw is not disabled.  (Tr. 26-35).  On October 25, 2013, the Appeals Council denied review.  (Tr. 1-3).  Yettaw timely filed for judicial review of the final decision on December 16, 2013.  (Doc. #1).

B.    **Background**

1.    *Yettaw's Disability Reports and Testimony*

At the time of the May 29, 2012 administrative hearing, Yettaw was 31 years old.  (Tr. 45).  She was 5'6" tall and weighed approximately 190 pounds.  (Tr. 55).  She graduated from high school in 1998 and attended one year of community college.  (Tr. 45, 50).  Initially, Yettaw testified that she was living in a house "with friends"; later in the hearing, the ALJ again asked, "These are just friends of yours that have taken you in?" to which Yettaw responded, "Yes."  (Tr. 58, 66-67).  Upon further questioning by the ALJ, however, Yettaw admitted that, in fact, she was living in a state-supported residential home, as required by court order.  (Tr. 69).

Indeed, Yettaw admitted at the hearing that she has had several "run-ins with the law," including convictions for driving on a suspended license, driving under the influence, possession of cocaine, and possession of methamphetamine.  (Tr. 62-63).  Yettaw also admitted that she used heroin in the past.  (Tr. 53).  She testified that she spent thirty days in jail and two years on probation for the 2006 cocaine possession charge.  (Tr. 62-63).  And, at the time of the hearing,

she was on three years of probation for the 2011 methamphetamine possession charge. (Tr. 63). Moreover, although she failed to mention this fact, correspondence dated November 20, 2012, from the Jackson County Sheriff indicates that she was incarcerated the same day as her administrative hearing (May 29, 2012) through September 20, 2012. (Tr. 179).

From 2000 to 2002, Yettaw worked as an assistant manager at a Speedway gas station. (Tr. 48-49). In that job, she suffered a work-related back injury, which required surgery. (Tr. 49-50). Subsequently, however, Yettaw settled her worker's compensation case (for $85,000) and returned to work in 2004 for some period of time. (Tr. 50). Yettaw later worked as an assistant manager at Marco's Pizza from 2006 to 2007. (Tr. 46). She has not worked at all since July of 2008. (Tr. 46, 56). Although Yettaw testified that she could not work full time because she would have to miss days due to her painful back, she testified that she had not missed any of her probation appointments which take place every two weeks. (Tr. 65).

Yettaw indicated that she still suffers from back pain, which is worsening, as well as depression.[1] (Tr. 66-67). At the time of the hearing, Yettaw testified that she had not been taking any medication other than ibuprofen since the end of 2011, and she felt better "without medicine" than she had previously. (Tr. 53, 55). She has one daughter, who was almost three at the time of the hearing and who lived with her father. (Tr. 55). She indicated that she is able to prepare simple meals, provide some basic assistance to her disabled mother, care for her own personal needs, do laundry (which requires carrying clothes up and down the stairs), clean up after herself, and shop in stores. (Tr. 57-59, 206-07). She is able to sit for 20 minutes, stand for 10-15 minutes, and walk approximately 15-20 minutes at a time. (Tr. 59). She does not drive

---

[1] In a March 2011 disability report, Yettaw also indicated that she suffers from bipolar disorder and attention deficit hyperactivity disorder ("ADHD"). (Tr. 226). The ALJ found these alleged impairments to be non-severe, and Yettaw has not challenged that conclusion. (Tr. 28, 33).

because she does not have a driver's license.   (Tr. 59).   She follows written and spoken instructions "very well" and handles stress and changes in routine well too.   (Tr.209-10).

### 2.   *Medical Evidence*

As the ALJ noted, there is no indication in the record that Yettaw received any treatment for her back impairment between her alleged onset date (December 31, 2007) and August 2008. At that time, Yettaw presented to the emergency room at Chelsea Community Hospital, complaining of back pain that was an 8/10 on the pain scale.   (Tr. 383-84).   Treatment notes reveal that she was taking only Motrin for pain.   (Tr. 383).   On examination, her spine was aligned with normal curvature, and there was no vertebral point tenderness.   (*Id.*).   There was right-sided lumbar paraspinal muscle tenderness, and straight leg raising caused pain on her right leg (but not her left).   (*Id.*).   Yettaw was offered injections of pain medication but became agitated and refused, saying that she did not have time to wait and just wanted her prescription for narcotics.   (Tr. 384).   Noting that Yettaw had only been in the emergency room for an hour, the physician indicated that he was "suspicious that there is drug-seeking behavior."   (*Id.*).

A year later, on August 1, 2009, Yettaw returned to the emergency room, requesting Percocet for her back pain.   (Tr. 381-82).   Notes reflect that she was given a prescription, despite the fact that there was no evidence of an acute surgical problem, her extremities were unremarkable, and only limited range of motion in her back and tenderness in the lumbar spine were noted.   (Tr. 381).   She was advised that she should not continue to come to the emergency room for prescription refills and that "any further pain medication should be gotten from her primary care physician or pain doctor."   (*Id.*).   One month later, however, on September 12, 2009, Yettaw returned to the emergency room, again complaining of back pain.   (Tr. 251-52). On examination, her back was straight with no palpable spasm.   (Tr. 251).   It is unclear from the

4

record whether additional Percocet was prescribed.

Over the course of the next month, Yettaw made four additional visits to the Chelsea Community Hospital emergency room, each time complaining of back pain and requesting narcotics. (Tr. 368-76). On September 28, 2009, the attending physician noted that she had lied about driving herself to the hospital and voiced a suspicion of drug-seeking behavior. (Tr. 374-76). On October 4, 2009, the attending physician noted that her pain was "almost out of proportion to [the] examination. She lunged off the bed and screamed when I touched her flesh minimally …." (Tr. 373). She was prescribed only three days of oxycodone and again advised that it was inappropriate "to be seeking narcotic management in the Emergency Department." (*Id.*). The very next day, however, Yettaw returned to the emergency room, indicating that her family practice doctor had refused to give her narcotics. (Tr. 370-71). The attending physician again indicated a suspicion that she was "drug seeking and drug dependent" and gave her a prescription for only a couple of days of oxycodone. (Tr. 371). Less than two weeks later, Yettaw returned to the emergency room, complaining that she had been out of her narcotic pain medications for a few days and was experiencing back pain. (Tr. 368-69). She was offered a variety of non-narcotic pain medications, which she refused, and she indicated that she was scheduled to see a back specialist (Dr. Brian Chodoroff) in a couple of days. (*Id.*).

On October 22, 2009, Yettaw had her initial evaluation with Dr. Chodoroff. (Tr. 313-14). She reported that her back pain was worsening, and on examination she had tenderness over the low back and increased pain with straight leg raising. (*Id.*). Dr. Chodoroff noted that Yettaw lied to him about her use of oxycodone; as a result, he had Yettaw sign an opioid agreement and indicated a desire to rule out opioid overuse. (Tr. 314, 356). He also ordered lumbar x-rays (which showed only mild scoliosis and narrowing and minimal degenerative spurring) and EMG

5

testing (which showed no radiculopathy).  (Tr. 272, 310, 314).  At Yettaw's next visit to Dr.

Chodoroff, on November 10, 2009, he discussed her EMG results, as well as the "absence of

gross instability on [lumbar spine] x-rays."  (Tr. 309).  Dr. Chodoroff also confronted Yettaw

about the results of her urine drug screen, which revealed that she had been taking methadone.

(Tr. 309, 324).  He asked her to provide records from the methadone clinic and refused to

prescribe opiates.  (Tr. 309).  By letter dated November 16, 2009, the methadone clinic advised

Dr. Chodoroff as follows:

> Having met multiple criteria for admission, one of which is opiate
> addiction greater than one year (including illicit methadone use of 30-90
> mg per day), [Yettaw] has received methadone opiate addiction treatment
> here since July 9, 2009.  This has been with limited success, as there is
> consistent non-compliance to clinic guidelines, including ongoing positive
> urine drug screen results for opiates and self-directed care.  She has
> prescriptions from another physician for Percocet and Vicodin ER, which
> she refuses to discontinue due to her chronic pain issues.
>
> We initially accepted her for treatment as an opioid addition patient with
> secondary chronic pain issues, but it has become apparent that she is
> inappropriate for this treatment setting and is in actuality a primary
> chronic pain patient.  Upon your acceptance of Ms. Yettaw as a client to
> your clinic, she is to be discharged from treatment at this agency.

(Tr. 367).  Yettaw then returned to see Dr. Chodoroff, who reviewed the opioid agreement with

her, administered epidural injections, and prescribed physical therapy.  (Tr. 305-06).  Over the

next couple of months, Yettaw continued to treat with Dr. Chodoroff, but by March 2010,[2] he

indicated that these modalities were not helping her pain, and she sought a surgical evaluation

with Dr. Douglas Geiger (who she had seen in the past).  (Tr. 296-301).

On March 8, 2010, Yettaw had a surgical consultation with Dr. Geiger, who noted that

---

[2] On March 26, 2010, Dr. Chodoroff received a call from the office of "Dr. Davis," indicating
that Yettaw had been discharged from that office due to opioid issues.  (Tr. 294).  It was
determined that Yettaw had been receiving opioids from both Dr. Chodoroff's and Dr. Davis'
offices; as a result, Yettaw was informed by Dr. Chodoroff that she would no longer be
prescribed medication by his office either.  (*Id.*).

she had severe pain with even just light palpation of her skin (which he characterized as a "very amplified and dramatic response"). (Tr. 365). He noted that she had shaking in her right leg, but intact sensory and motor function. (*Id.*). Review of x-rays taken that day revealed degenerative changes to the lower three lumbar discs, central disc protrusions greatest at L5-S1, and no neurological impingement. (Tr. 273, 365). Dr. Geiger did not believe surgery was appropriate; instead, he advised Yettaw to stop smoking, lose weight, exercise, and take fewer narcotics. (Tr. 366). Dr. Geiger indicated that Yettaw "was not very happy with these suggestions and demanded that she would find a surgeon to fix her." (*Id.*).

Evidently she did, because in April 2010, she underwent a lumbar microdiscectomy with Dr. Nilesh Kotecha, who opined that she was disabled for four to six weeks post-operatively. (Tr. 260, 277). One week later, she reported less pain and was again advised to lose weight or risk recurrent disc herniation. (Tr. 260). When she returned to the doctor on June 3, 2010, Yettaw appeared to have lost some weight, seemed much less uncomfortable when seated and moving about, and was able to rise from the chair with minimal effort. (Tr. 289). She had normal gait and lower extremity strength and was noted to be clinically improving overall. (*Id.*). By her next visit, on July 1, 2010, she reported walking 30 minutes twice daily. (Tr. 285).

In September 2010, Yettaw began treating with Dr. Eric Kovan at Rehabilitation Physicians in Novi, Michigan. (Tr. 413-14). On examination, Yettaw had full strength in her upper and lower extremities, and her gait was normal when distracted. (Tr. 414). Dr. Kovan ordered an EMG of her lower extremities (which was within normal limits). (Tr. 412). He also ordered an MRI of her lumbar spine, which showed degenerative disc disease and bulging discs at two levels, but no nerve root compression.[3] (Tr. 415-16). Over the course of the next few

---

[3] Prior MRIs performed in 2009 and 2010 also revealed dessication and bulging, as well as some

7

months, Dr. Kovan administered three epidural injections to Yettaw, which did not provide "much relief."  (Tr. 409-11).  On February 15, 2011, however, Dr. Kovan discharged Yettaw from his care after she tested positive for heroin.  (Tr. 407).

There is also evidence in the record that Yettaw was diagnosed with major depressive disorder.  (Tr. 422-25).  She indicated that she had taken Zoloft, Paxil, and Cymbalta in the past with no success.  (Tr. 423).  At an initial psychiatric evaluation with Dr. Anjali Mehta in November 2010, Dr. Mehta offered to prescribe a higher dose of Zoloft – which Yettaw indicated had worked in the past – but she declined, indicating that she preferred to be prescribed "ADHD medication."  (Tr. 424-25).  There is no indication that she returned to see Dr. Mehta.

### 3.    *Vocational Expert's Testimony*

Carrie Anderson testified as an independent vocational expert ("VE") at the administrative hearing before the ALJ.  (Tr. 71-73).  The VE characterized Yettaw's past relevant work as skilled in nature and performed at the light exertional level.  (Tr. 71).  Then, the ALJ asked the VE to imagine a claimant of Yettaw's age, education, and work experience, who could perform light work, with the following additional limitations:  no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, and crouching; no crawling; no concentrated exposure to extreme cold, heat, or excessive vibration; no concentrated use of moving machinery or concentrated exposure to unprotected heights; and must be work requiring only simple, routine, and repetitive tasks.  (Tr. 71-72).  The VE testified that the hypothetical individual would not be capable of performing Yettaw's past relevant work.  (Tr. 72).  However, the VE testified that the hypothetical individual would be capable of working in the positions of ticket seller (2,300 jobs in Michigan's

---

mild stenosis, but no nerve root compression.  (Tr. 265-66, 270-71).

lower peninsula), small parts sorter (12,000 jobs), and storage leasing agent (10,300 jobs).  (*Id.*).

**C.    Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability."  *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant

part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing

20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps …. If the

analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Yettaw is not disabled under the Act.  At Step One, the ALJ found that Yettaw has not engaged in substantial gainful activity since December 31, 2007, the alleged onset date.  (Tr. 28)  At Step Two, the ALJ found that Yettaw has the severe impairments of status post lumbar spine surgery, degenerative disc disease of the lumbar spine, obesity, and major depressive disorder.  (Tr. 28-29).  At Step Three, the ALJ found that Yettaw's impairments do not meet or medically equal a listed impairment. (Tr. 29-30).

The ALJ then assessed Yettaw's residual functional capacity ("RFC"), concluding that she is capable of performing light work, with the following additional limitations:  no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, and crouching; no crawling; no concentrated exposure to extreme cold, heat, or excessive vibration; no concentrated use of moving machinery or concentrated exposure to unprotected heights; and must be work requiring only simple, routine, and repetitive tasks. (Tr. 30-34).

At Step Four, the ALJ determined that Yettaw is unable to perform her past relevant work as an assistant manager.  (Tr. 34).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Yettaw is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 34-35).  As a result, the ALJ concluded that Yettaw is not disabled under the Act.  (Tr. 35).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human*

*Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.     Analysis**

Yettaw argues that the ALJ erred in: (1) failing to find that she meets or medically equals a listed impairment; (2) evaluating her credibility; and (3) failing to sufficiently develop the record.  (Doc. #11 at 9-19).  Each of these arguments will be addressed in turn.

> 1.     *The ALJ's Conclusion that Yettaw Does Not Have a Listing*
> *Level Impairment is Supported by Substantial Evidence*

In this case, the ALJ found that Yettaw has the severe impairments of status post lumbar spine surgery and degenerative disc disease of the lumbar spine.  (Tr. 28).  He then went on at Step Three to conclude that her "impairments do not meet or medically equal the criteria set forth in listing 1.04 or any other listed impairment."  (Tr. 29).  Yettaw now argues that the ALJ's conclusion that she did not meet the criteria for Listing 1.04A constitutes legal error warranting remand.  (Doc. #11 at 9-13).

Yettaw bears the burden of proving that her impairments meet or medically equal a particular listing.  *See Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to

12

prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 CFR § 404.1525(a). In other words, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled. *See Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165, at *2 (6th Cir. Apr. 1, 2011). "A claimant must satisfy all of the criteria to meet the listing." *Rabbers,* 582 F.3d at 653. Moreover, all of the criteria must be met concurrently for a period of twelve continuous months. *See* 20 C.F.R. §404.1525(c)(3), (4); 20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.00D ("[b]ecause abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation").

Listing 1.04A covers disorders of the spine, including degenerative disc disease and spinal stenosis, which result in compromise of a nerve root or the spinal cord with:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) ….

20 C.F.R. Pt. 404, Subpt. P, Appx. 1, §1.04A. In arguing that she meets the criteria of this listing, Yettaw relies exclusively on Dr. Kovan's December 2010 findings that "she suffered from 'Right L4-L5 Radiculopathy,' 'Positive disc herniation,' and 'Positive straight leg raising' as of his December 8, 2010 exam." (Doc. #11 at 12 (citing Tr. 410)). The ALJ's finding that Yettaw suffered the severe impairments of, among others, status post lumbar spine surgery, and degenerative disc disease of the lumbar spine, is appropriately consistent with Dr. Kovan's findings. But that does not establish that *all* of the specific elements of Listing 1.04A have been met. *Rabbers,* 582 F.3d at 653.

Yettaw presents no evidence of "limitation of motion of the spine [or] motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or

reflex loss." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, §1.04A. She also fails to establish the durational requirements. Indeed, Dr. Kovan noted on December 8, 2010, that Yettaw's physical examination was nonfocal regarding her strength, reflexes, and sensation, and her gait was normal. (Tr. 410). His October 2010 treatment note indicated that an EMG study of her lower extremities was within normal limits. (Tr. 412). And, his September 2010 examination findings showed some tenderness with positive straight leg raising and some giveaway weakness in the right leg, but normal strength (5/5) in Yettaw's arms and legs, normal reflexes, and – when Dr. Kovan distracted her – a normal gait. (Tr. 414). Thus, even if the Court was persuaded that Dr. Kovan's December 8, 2010 findings satisfied all of the listing criteria, there is no indication that these criteria were met concurrently for a period of twelve continuous months. *See* 20 C.F.R. §404.1525(c)(3), (4).

In addition, the ALJ's conclusion that Yettaw does not meet the criteria of Listing 1.04A is supported by the opinions (which found that Yettaw could perform "unskilled" and "light" work) of the state agency medical consultants, Dennis Beshara, M.D., and B.D. Choi, M.D., which the ALJ gave great weight. (Tr. 33, 97-110). "The signature of a State agency medical or psychological consultant on [a] Disability Determination and Transmittal Form … ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Soc. Sec. Rul. 96-6p*, 1996 WL 374180, at *3 (July 2, 1996). Thus, the ALJ's conclusion that Yettaw does not meet or medically equal Listing 1.04A is supported by substantial evidence.

### 2.    *The ALJ's Credibility Determination is Supported by Substantial Evidence*

In evaluating Yettaw's allegations, the ALJ found that, while her impairments cause significant limitations, she was not credible to the extent she alleged disabling limitations. (Tr.

14

31).  Before this Court, Yettaw argues that the ALJ erred in reaching this conclusion and that he failed to provide specific reasons for this credibility determination.  (Doc. #11 at 13-16).

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'"  *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record.  *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).  Rather, when a complaint of pain or other symptom is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians … and any other relevant evidence in the case record" to determine if the claimant's claims regarding the severity of her symptoms are credible.  *Soc. Sec. Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1996); *see also* 20 C.F.R. §404.1529.  Such relevant evidence includes the claimant's daily activities; details surrounding the claimant's pain or other symptoms; any precipitating or aggravating factors; type, dosage, effectiveness, and side effects of any medication the claimant takes; the claimant's treatment, other than medication; any measures the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  *See* 20 C.F.R. §404.1529(c)(3).  In addition, Social Security

15

Ruling 96-7p requires that the ALJ provide a sufficiently specific explanation for his credibility determination so that it is clear to the individual and any subsequent reviewers the weight given to the individual's statements and the reasons for that weight.  *See Soc. Sec. Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1996).

In this case, after finding at Step Two that Yettaw has the severe impairments of status post lumbar spine surgery, degenerative disc disease of the lumbar spine, obesity, and major depressive disorder (Tr. 28-30), the ALJ concluded that she has the residual functional capacity to perform a reduced range of light work that involves only simple, routine, and repetitive tasks (Tr. 30-34).  Contrary to Yettaw's assertion, the ALJ's credibility determination consists of much more than a single sentence that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Doc. #11 at 15-16 (quoting Tr. 31)).

Rather, in reaching his conclusion about Yettaw's credibility, the ALJ specifically considered and discussed the relevant factors, including the objective medical evidence, her need for various medications, her course of treatment, and her activities of daily living.  For example, Yettaw argues that her "medical records are replete with complaints *consistently* corroborating her physicians [sic] findings of sever [sic] spinal disorders."  (Doc. #11 at 15 (emphasis in original)).  However, the ALJ *agreed* with Yettaw and her physicians that she had severe spinal impairments, as he found that her "status post lumbar spine surgery" and "degenerative disc disease" were severe impairments.  (Tr. 28-30).  The ALJ further stated that "the evidence clearly demonstrates [Yettaw's] history of back problems."  (Tr. 33).

After finding Yettaw's back impairments severe, the ALJ properly explained that the issue was whether and to what extent Yettaw's allegations were credible regarding "the severity

of the pain and restrictions she experience[d] as well as her need for various medications ….”
(Tr. 33).   The ALJ reasonably found her allegations to be “highly suspect given repeated
evidence of drug seeking behavior.”   (*Id.*).   The ALJ pointed out that Yettaw had tested positive
for illegal drugs and was currently on probation for a drug-related offense.   (Tr. 33, 63, 324,
407).   He noted that Yettaw further demonstrated a pattern of dishonest behavior by
“present[ing] repeatedly to ERs and a variety of doctors for narcotics.”   (Tr. 33, 368-69, 371,
381-82, 384).   The ALJ also noted that Yettaw was discharged from Victory Clinic (where she
was being treated for opioid addiction) due to noncompliance with treatment and testing positive
for banned substances.   (Tr. 33, 367).   Moreover, the ALJ pointed out that Yettaw was
discharged by Dr. Davis when he discovered she was receiving opioids from both himself and
Dr. Chodoroff, and she was discharged by Dr. Kovan after she tested positive for heroin.   (Tr.
33, 294, 407).   The ALJ then reasonably concluded that these events suggest that Yettaw’s “need
for narcotics is not necessarily pain related and that, given the results of her physical exams and
objective testing, she is not precluded from performing work related tasks within the parameters
of the [ALJ’s] residual functional capacity [finding].”   (Tr. 33).   This was a relevant
consideration, as “[c]ourts have held that drug seeking behavior can form a basis for rejecting a
claimant’s testimony regarding pain and limitations.”   *Doornbos v. Comm’r of Soc. Sec.*, 2014
WL 4987807, at *5 (W.D. Mich. Sept. 29, 2014) (internal citations omitted).

The ALJ also considered Yettaw’s course of treatment, noting that although she had
“significant interventions such as surgery, epidural steroid injections, and periodic narcotic pain
medication,” these treatments were “inconsistent and in the interim, [she] manages with nothing
more than Ibuprofen.”   (Tr. 33).   Indeed, as the ALJ noted, there is no record of any medical
treatment between her alleged onset date (December 31, 2007) and August 2008.   (Tr. 31).   *See*

20 C.F.R. §404.1529(c)(3)(v) (treatment a claimant receives is relevant to credibility of her allegations of symptoms and pain).  Moreover, when she did seek care in August 2008, she indicated that she was taking only Motrin (ibuprofen) for her alleged severe pain.  (Tr. 383). And, at the time of the administrative hearing, Yettaw testified that she had stopped taking all prescription medication at the end of 2011, was taking only ibuprofen for her pain and swelling, and was feeling better since that time.  (Tr. 53-55, 61).  These facts, too, were relevant to a credibility determination.  *See* 20 C.F.R. §404.1529(c)(3)(iv) (proper to consider the type, dosage, effectiveness, and side effects of medication taken).

In evaluating Yettaw's credibility, the ALJ also considered the fact that the record contains "several instances of physical examinations that are inconsistent with [Yettaw's] complaints as well as episodes of amplified and dramatic responses to light palpation."  (Tr. 32). For example, at an October 4, 2009, emergency room visit, Yettaw's pain was characterized as "almost out of proportion" to the examination when she "lunged off the bed and screamed" after the attending physician touched her "minimally."  (Tr. 32, 373).  And, in March 2010, Dr. Geiger notified that she had a "very amplified and dramatic response" to even light palpation of her skin.  (Tr. 365).  These facts support the ALJ's credibility determination.  *See Soc. Sec. Rul. 96-7p*, 1996 WL 374186, at *5 (July 2, 1996) (statements from a treating physician about the claimant's medical history are relevant to a credibility determination).

Finally, the ALJ considered Yettaw's daily activities in evaluating the credibility of her allegations of disabling pain, noting that she prepares simple meals, does dishes and laundry, goes grocery shopping, and manages her finances.  (Tr. 31, 57-59, 206-07).  As noted above, *supra* at 3, Yettaw testified that doing the laundry required her to carry the clothes up and down stairs.  It was appropriate for the ALJ to consider that Yettaw is capable of performing these

18

activities.  *See* 20 C.F.R. §404.1529(c)(3)(i).

In sum, contrary to Yettaw's argument – which focuses on only one paragraph from the ALJ's decision and ignores vast swaths of analysis – the ALJ properly considered the factors discussed above in evaluating Yettaw's credibility, and that credibility determination is supported by substantial evidence.  *See* 20 C.F.R. §404.1529(c)(2),(3), and(4).

### 3.    *The ALJ Adequately Developed the Record*

Yettaw also argues that, because she was not represented by counsel at the administrative hearing, the ALJ had a duty to ensure that the record was properly developed, and that he breached that duty.  (Doc. #11 at 17-19).  As Yettaw correctly points out, the Sixth Circuit has recognized that, when a claimant appears without counsel, is incapable of presenting an effective case, and is unfamiliar with hearing procedures, the ALJ has a "special, heightened duty" to develop the administrative record and ensure a fair hearing.  *See Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)); *Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 1986).  However, whether an ALJ has satisfied his "special, heightened duty" to develop the record is determined on a case-by-case basis.  *See Osburn v. Apfel*, 1999 WL 503528, at *7 (6th Cir. July 9, 1999); *Lashley*, 708 F.2d at 1052.

In this case, Yettaw appeared at the hearing and affirmatively waived representation by counsel.  (Tr. 43, 162).  She indicated that she had participated in a prior administrative hearing in this case (in 2007) and that she had spoken with her attorney "about what was going to happen" at the 2012 hearing.  (Tr. 41, 43).  Yettaw specifically declined to adjourn the hearing to have an attorney appear with her.  (Tr. 44).  The ALJ clearly defined the issues for Yettaw, and she indicated that she understood them.  (Tr. 43-44).  Thus, there is no indication in the record that Yettaw was "unfamiliar with hearing procedures."  *Lashley*, 708 F.2d at 1051-52.

19

With respect to remaining prong of the *Lashley* test – whether the claimant was incapable of presenting an effective case – Yettaw asserts in conclusory fashion that "the hearing transcript discloses her patent lack of grasp of the proceedings and the inadequacy of his [sic] case presentation to the ALJ." (Doc. #11 at 17).  However, Yettaw fails to identify any specific so-called inadequacies.  Indeed, the only example she cites from the hearing transcript is the ALJ's alleged failure "to further inquire as to the nature of her statement that many days she 'can't walk at all,'" and she claims the ALJ should have explored the extent of this incapacity and its effect on her ability to work full-time hours, five days a week. (*Id.* at 17-18 (internal citations omitted)).  It is clear, though, that Yettaw's testimony that some days she "can't walk at all" was just that:  her own subjective testimony that did not necessarily require any further inquiry.  The ALJ considered this testimony, as well as her seemingly conflicting earlier statements that she can walk "around a block" and for "15-20 minutes" (Tr. 59), and reasonably concluded that her allegations of disabling limitations were not fully credible.  Thus, even if the ALJ had a "special, heightened duty" under *Lashley*, the Court finds no error in his decision not to probe deeper into the specifics of this single phrase.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [15] be GRANTED, Yettaw's Motion for Summary Judgment [11] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: December 31, 2014                            s/David R. Grand
Ann Arbor, Michigan                                 DAVID R. GRAND
                                                    United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 31, 2014.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager